1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                   **CENTRAL DISTRICT OF CALIFORNIA**

10

11  STACY DEANN ALLEE,            )       NO. ED CV 14-789-E
                                  )
12              Plaintiff,        )
                                  )
13      v.                        )       **MEMORANDUM OPINION**
                                  )
14  CAROLYN W. COLVIN,            )
    Commissioner of Social        )
15  Security,                     )
                                  )
16              Defendant.        )
    _____ )
17

18

19                        **PROCEEDINGS**

20

21      Plaintiff filed a complaint on April 30, 2014, seeking review of

22  the denial of disability benefits.  The parties filed a consent to

23  proceed before a United States Magistrate Judge on May 27, 2014.

24  Plaintiff filed a motion for summary judgment on November 5, 2014.

25  Defendant filed a cross-motion for summary judgment on January 5,

26  2015.  The Court has taken both motions under submission without oral

27  argument.  See L.R. 7-15; "Order," filed May 6, 2014.

28  ///

## BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION

Plaintiff applied for Supplemental Security Income on April 28, 2011, asserting disability since April 30, 2001 (Administrative Record ("A.R.") 150-56).[1]  Plaintiff worked part time as a janitor from 1998 through 2001, her only period of employment within 15 years of the filing of her application (A.R. 171; see also A.R. 161, 165 (earnings record)).  Plaintiff asserts disability based on alleged mental and physical impairments (A.R. 35-47, 170).  An Administrative Law Judge examined the medical record and heard testimony from Plaintiff and a vocational expert (A.R. 6-530).

The ALJ found that Plaintiff has the following severe impairments: "degenerative disc disease of the cervical spine, hyperlipidemia, fibromyalgia, migrating polyarthralgias with possible synovitis, coronary artery disease (CAD), status post angioplasty, osteoarthritis, migraines, hypertension, myocardial infarction, carpal tunnel syndrome (CTS), attention deficit hyperactivity (ADHD), bipolar disorder, depression, and anxiety" (A.R. 11).  The ALJ also found, however, that Plaintiff retains the residual functional capacity to perform a limited range of light work (A.R. 13).  Specifically, the ALJ found that Plaintiff:

> can lift and/or carry 20 pounds occasionally and 10 pounds
> frequently; she can stand and/or walk for 6 hours out of an
> 8-hour workday with regular breaks, but no more than 15 to

---

[1]   Plaintiff previously had been denied disability benefits as of October 8, 2009 (A.R. 166).

2

1     20 minutes at a time; she can sit for six hours out of an
2     eight-hour workday with regular breaks, but she must have
3     brief position changes after 30 to 45 minutes; she can
4     occasionally bend, stoop, climb stairs, balance, kneel,
5     crawl, squat, and crouch; she cannot climb ladders, ropes,
6     or scaffolds; she cannot work at unprotected heights, around
7     moving machinery, or around other hazards; she cannot
8     perform repetitive or constant pushing and/or pulling with
9     her hands; she cannot perform repetitive or constant gross
10    or fine manipulation with both hands; she cannot perform
11    jobs requiring hypervigilance or intense concentration on a
12    particular task; she can adapt to minimal workplace changes;
13    she cannot perform fast paced production work or assembly
14    line type work; she cannot have concentrated exposure to
15    extreme temperatures, pulmonary irritants, and vibrations;
16    and she can have occasional and incidental contact with the
17    public.

18

19    (A.R. 13, 18-20 (adopting in part non-examining State agency physician
20    opinions at A.R. 62-90, and a psychiatric consultative examiner's
21    opinion at 463-69)).  In so finding, the ALJ: (1) discounted the
22    contrary opinion of Dr. Ann Hamilton, one of Plaintiff's treating
23    physicians; and (2) found Plaintiff's testimony less than fully
24    credible (A.R. 14-20).

25

26        The ALJ adopted the testimony of the vocational expert in
27    concluding that a person having the limitations the ALJ found to exist
28    could perform light, unskilled jobs as an "assembler," an "inspector,"

1  and a "packager" - jobs existing in significant numbers in the
2  national economy (A.R. 20-21, 55-56).  The Appeals Council denied
3  review (A.R. 1-3).
4
5                        **STANDARD OF REVIEW**
6
7       Under 42 U.S.C. section 405(g), this Court reviews the
8  Administration's decision to determine if: (1) the Administration's
9  findings are supported by substantial evidence; and (2) the
10 Administration used correct legal standards.  See Carmickle v.
11 Commissioner, 533 F.3d 1155, 1159 (9th Cir. 2008); Hoopai v. Astrue,
12 499 F.3d 1071, 1074 (9th Cir. 2007); see also Brewes v. Commissioner,
13 682 F.3d 1157, 1161 (9th Cir. 2012).  Substantial evidence is "such
14 relevant evidence as a reasonable mind might accept as adequate to
15 support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401
16 (1971) (citation and quotations omitted); see also Widmark v.
17 Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006).
18
19      If the evidence can support either outcome, the court may
20      not substitute its judgment for that of the ALJ.  But the
21      Commissioner's decision cannot be affirmed simply by
22      isolating a specific quantum of supporting evidence.
23      Rather, a court must consider the record as a whole,
24      weighing both evidence that supports and evidence that
25      detracts from the [administrative] conclusion.
26
27 Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and
28 quotations omitted).

                                  4

**DISCUSSION**

After consideration of the record as a whole, Defendant's motion is granted and Plaintiff's motion is denied.  The Administration's findings are supported by substantial evidence and are free from material[2] legal error.

**I.   Summary of the Medical Record.**

Plaintiff's primary care physician, Dr. Ann Hamilton, reportedly treated Plaintiff with regular medication visits every three months from July 2008 through at least June 2012 (A.R. 53, 174, 520).  The Administration requested Dr. Hamilton's treatment records for the period from May 2010 (one year before the month in which Supplemental Security Income first could have been payable to Plaintiff) through January 2012 (A.R. 438, 482; see also A.R. 16 (ALJ explaining relevant time period for benefits)).  Dr. Hamilton's records are summarized below.[3]

---

[2]   The harmless error rule applies to the review of administrative decisions regarding disability.  See Garcia v. Commissioner, 768 F.3d 925, 932-33 (9th Cir. 2014); McLeod v. Astrue, 640 F.3d 881, 886-88 (9th Cir. 2011); Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

[3]   The record also contains reports for several emergency room visits to Parkview Community Hospital dating from March 2006 through May 2011 (A.R. 232-402).  These visits primarily were to address various types of alleged pain (id.).  On August 12, 2007, March 18, 2009, and March 27, 2009, Plaintiff presented with alleged migraines for which she was given medications (A.R. 356-71, 388-95).  On October 24, 2007, Plaintiff presented for treatment for neck pain allegedly radiating to her shoulder and arm (A.R. 380-87).  She was diagnosed with cervical radiculopathy
(continued...)

1    On July 22, 2010, Plaintiff reported bilateral knee, foot, and

2  wrist pain for two months (worse in the morning if sitting too long),

3  and an episode of chest pain radiating to the left arm the previous

4  week (A.R. 448).  Dr. Hamilton diagnosed possible anterior myocardial

5  infarction (heart attack), and leg, foot, and wrist pain (A.R. 450).

6  Dr. Hamilton referred Plaintiff to the emergency room and prescribed

7  hydrocodone (A.R. 450).  The only laboratory results provided by Dr.

8  Hamilton for any of Plaintiff's treatments accompany this visit.  An

9  EKG form reflects "possible anterior infarction" and "sent to ER

10 [with] copy" (A.R. 451-52).[4]  Blood chemistry results from April 26,

11 2010, show high triglycerides and LDL cholesterol (A.R. 453-54).

12

13    On December 9, 2010, Plaintiff reported that she sprained her

14 right ankle, had mid back pain, and a "social services form" (A.R.

15 ///

16

_____

17    [3](...continued)
   and neck pain and prescribed pain medication (A.R. 382).  On
18 January 25, 2008, Plaintiff claimed another migraine and chest
   pain for which she was given medication (A.R. 372-79).  On
19 May 27, 2009, Plaintiff presented for treatment for chest pain
   allegedly radiating to the left arm, and a poorly controlled
20 migraine secondary to medication noncompliance (A.R. 306-21).
   Plaintiff was given aspirin, nitroglycerine paste, and a saline
21 IV (A.R. 309).  A scan of Plaintiff's heart showed reversible
   myocardial ischemia (restriction in blood supply) in the anterior
22 segment (A.R. 313-14).  On testing, Plaintiff had a full range of
   motion in all of her extremities, no tenderness, normal gait and
23 muscle strength, with sensory intact.  See A.R. 357, 365, 373,
   381, 389.
24
25    The remainder of Plaintiff's emergency room treatment
26 records, which coincide with Dr. Hamilton's available treatment
   records, are summarized herein.
27
      [4]    There is no evidence in the record that Plaintiff went
28 to the emergency room as directed.

445).[5]  Dr. Hamilton observed that Plaintiff "comes up [with] 1 excuse after another – now comes up [with] tender feet" (A.R. 445).  On examination, Dr. Hamilton indicated that Plaintiff's feet were "not tender or numb to testing now" (A.R. 447).  Dr. Hamilton assessed Plaintiff with an ankle sprain, back pain, and hypertension, and refilled Plaintiff's hydrocodone prescription (A.R. 447).

On March 30, 2011, Plaintiff complained of a cold and sought hydrocodone for alleged leg, foot, and wrist pain (A.R. 442-44).  Dr. Hamilton noted that Plaintiff had sinus problems, her gait was stiff on her right side, and her wrist was tender (A.R. 443-44).  Dr. Hamilton diagnosed Plaintiff with a cough, osteoarthritis of the wrist, ankle, and knee, and a viral infection, and prescribed Mucinex, Fluoxetine, and hydrocodone (A.R. 444).

On June 2, 2011, Plaintiff reported to Dr. Hamilton that she had been in the hospital 3-4 days for a "heart attack" (A.R. 439;

///

---

[5]  Plaintiff had been to the emergency room three times since her previous appointment with Dr. Hamilton.  On August 5, 2010, Plaintiff presented to the emergency room for treatment for left leg pain and contusions after Plaintiff tripped over a stool.  Plaintiff was given Tylenol (A.R. 265-73).  On October 17, 2010, Plaintiff presented to the emergency room for treatment for right ankle pain due to an ankle sprain.  Plaintiff was given Vicodin, crutches, and a splint (A.R. 274-92).  Plaintiff reportedly had fallen from her dresser after chasing a pet squirrel (A.R. 279).  On November 3, 2010, Plaintiff presented to the emergency room for treatment for alleged back and right shoulder pain.  Plaintiff was given Flexeril (A.R. 258-64).  As of the latest testing, Plaintiff had a full range of motion in all of her extremities, no tenderness, normal gait and muscle strength, with sensory intact.  See A.R. 258.

quotations original).[6]  Plaintiff was diagnosed with, <u>inter alia</u>,
athlete's foot, coronary artery disease, hypertension, and
hypercholesterolemia (A.R. 441).  Dr. Hamilton continued Plaintiff's
medications, adding a topical cream for the athlete's foot, and told
Plaintiff to continue treatment with cardiologist Dr. Patankar (A.R.
441).

     On October 3, 2011, Plaintiff reported increasing migraines and
hot flashes, and requested a referral for osteoarthritis of her
wrists, hands, and elbows (A.R. 487).  On examination, Dr. Hamilton
noted that Plaintiff was anxious and depressed (A.R. 488-89).  Dr.
Hamilton assessed osteoarthritis of the hands, elbows, and back,
depression, and migraine headaches (A.R. 489).  Dr. Hamilton
prescribed hydrocodone and continued Plaintiff's other medications
(A.R. 489).  Dr. Hamilton made no referral (A.R. 489).  Attached to
the report for this visit were cardiology treatment notes from July
2011 and results from an August 2011 heart scan by Plaintiff's

---

[6]     Plaintiff had been to the emergency room twice since
her previous appointment with Dr. Hamilton.  On April 12, 2011,
Plaintiff presented to the emergency room for treatment for
abdominal pain and vomiting for which she received medications
(A.R. 245-57).  On May 14, 2011, Plaintiff presented to the
emergency room for treatment for left-sided chest pain radiating
to the left arm (A.R. 232-44).  She was tachycardic to 102 heart
beats per minute on examination and was admitted to rule out
myocardial infarction (A.R. 233).  Doctors diagnosed acute chest
pain and acute coronary syndrome (<u>i.e.</u>, an umbrella term for
situations (like heart attacks) where the blood supply to the
heart muscle is suddenly blocked) (A.R. 232).  <u>See</u> American Heart
Association, Acute Coronary Syndrome, available online at
http://www.heart.org/HEARTORG/conditions/heartattack/
aboutheartattacks/acute-coronary-syndrome_UCM_428752_article.jsp
(last visited Jan. 22, 2015).  Plaintiff was treated with
medications and released (A.R. 233, 235).

1  cardiologist, which showed largely normal results (discussed below)

2  (A.R. 490-92).  Plaintiff's cardiologist diagnosed coronary artery

3  disease, post angioplasty, and chest pain (A.R. 492).

4

5       On January 30, 2012, Plaintiff reported with neck and shoulder

6  pain, pain in her hands (both thumbs), and insomnia (A.R. 483).  Dr.

7  Hamilton observed that Plaintiff's thumbs had knotty metacarpal

8  joints, and Dr. Hamilton assessed osteoarthritis of the hands and

9  insomnia (A.R. 485).  Dr. Hamilton refilled Plaintiff's Vicodin and

10  prescribed a new sleep medication (A.R. 485).

11

12      On May 8, 2012, Plaintiff returned and asked to see an orthopedic

13  surgeon for her alleged right wrist pain (A.R. 523).  Dr. Hamilton

14  observed that Plaintiff's right "mc-p [metacaropphalangeal] joint is

15  tender [with] enlarged joint," assessed osteoarthritis of the right

16  wrist, and referred Plaintiff to a rheumatologist (A.R. 525).[7]

17

18  _____

19      [7]   On June 29, 2012, rheumatologist Dr. Babak Zamiri
    evaluated Plaintiff (A.R. 515-16).  On examination, Dr. Zamiri
20  noted, inter alia, that Plaintiff's range of motion in her neck
    and shoulders was intact, no sign of deformity or atrophy in the
21  upper extremities, handgrip intact, good range of motion in
    Plaintiff's hips, no sign of synovitis (inflammation) in the
22  knees, no sign of ankle effusion or metatarsalgia, no sensory or
    motor deficits, and normal muscle strength in upper and lower
23  extremities (A.R. 516).  Dr. Zamiri diagnosed fibromyalgia with
    18/18 tender points, migratory polyarthralgia with possible
24  synovitis raising possibility of inflammatory arthritis,
    osteoarthritis, degenerative disc disease of the cervical spine,
25  depression, anxiety, and hyperlipidemia (A.R. 516).  Dr. Zamiri
    reportedly wanted to perform a detailed blood test and x-rays of
26  Plaintiff's hands, feet, and knees (which, if performed, are not
    included in the record) (A.R. 516).  Dr. Zamiri encouraged
27  Plaintiff to lose weight, stop smoking, and better manage her
    stress, depression, and insomnia (A.R. 516).
28

On June 26, 2012, Plaintiff presented Dr. Hamilton with a form to complete for Plaintiff's disability application (A.R. 520-22). Dr. Hamilton observed that Plaintiff had "scattered knotty PIP joints," and diagnosed osteoarthritis, bipolar affective disorder, chronic pain in multiple joints, and angina pectoris, for which Plaintiff was prescribed hydrocodone, Citalopram, Risperidone, and nitroglycerine (A.R. 522).

Dr. Hamilton completed the "Medical Opinion Re: Ability to Do Work-Related Activities (Physical)" form on June 26, 2012 (A.R. 517-19). Dr. Hamilton indicated that Plaintiff could: (1) lift 10 pounds occasionally and less than 10 pounds frequently; (2) stand and walk less than two hours in an eight-hour day, with the need to change positions after 15 minutes of standing; and (3) sit less than two hours in an eight-hour day, with the need to change positions after 20 minutes of sitting (A.R. 517). Dr. Hamilton indicated that Plaintiff would have to walk around every 30 minutes for an hour, and would need the option of shifting at will from sitting or standing/walking (A.R. 518). Dr. Hamilton indicated Plaintiff would not need to lie down at unpredictable intervals during a work shift (A.R. 518). Dr. Hamilton attached treatment records (A.R. 518-19; see also A.R. 520-25 (treatment records from May 8, 2012 and June 26, 2012)).

Dr. Hamilton opined that Plaintiff could never twist or climb ladders, rarely could climb stairs, and occasionally could stoop (bend) and crouch, and would have issues reaching overhead and with handling (gross manipulation) due to pain in Plaintiff's hand joints evidenced by tenderness and enlargement of the joints (A.R. 518). Dr.

Hamilton opined that Plaintiff should avoid extreme cold and heat, hazards, and environments with fumes, odors, dusts, gases, and poor ventilation (A.R. 519).  Plaintiff would have no restriction working with wetness or humidity or noise up to 80 decibels (A.R. 519).  Dr. Hamilton stated that Plaintiff's "joints are stiff [and] therefore lack useful mobility" and "also hurt when they are moved" (A.R. 519).  Dr. Hamilton opined that Plaintiff would be absent from work more than three times a month, stating that Plaintiff "recently developed angina pectoris" (i.e., chest pain and discomfort due to coronary heart disease) (A.R. 519).  See American Heart Association, Angina Pectoris (Stable Angina), available online at www.heart.org/HEARTORG/ conditions/heartattack/symptomsdiagnosisofheartattack/Angina-Pectoris-Stable-Angina_UCM_437515_Article.jsp (last visited Jan. 26, 2015).

Plaintiff received cardiology testing and treatment for heart failure and acute coronary syndrome from the Cardiology Specialists Medical Group, Inc., from July 2009 through at least August 2011 (A.R. 406-437, 460-62).  On May 29, 2009, Plaintiff underwent a left heart catheterization and a coronary angiogram, with angioplasty and stent placement (A.R. 424, 434).  On November 29, 2010, Plaintiff underwent a second left heart catheterization and a coronary angiogram, following a heart scan that showed mixed ischemia (restriction in blood supply to tissues), infarct of the inferior wall, "apical infarct versus artifact" (A.R. 412; see also A.R. 409 imaging results).  At her follow up visit on December 13, 2010, Plaintiff denied having any chest pain (A.R. 406).  At another follow up visit on July 26, 2011 (following Plaintiff's May 2011 hospitalization for chest pain), Plaintiff was assessed with coronary artery disease, post

1   angioplasty, and chest pain, and a scan was requested (A.R. 461-62).
2   Imaging from the scan on August 11, 2011, showed normal left
3   ventricular wall motion and thickening, left ventricular fraction at
4   77 percent, no ischemia or infarct, and an "artifact pattern of the
5   anterior apical wall(s) consistent with soft tissue attenuation
6   breast" (A.R. 460).

7

8       Regarding Plaintiff's alleged mental impairments, the record
9   contains a Riverside County Department of Mental Health initial
10  assessment dated May 17, 2009 (A.R. 527-29).  The assessment states:
11  "CPS intervened on or around March 2009 [secondary to patient] testing
12  positive for marijuana after a period of time in which her 16 [year
13  old] son failed to return home (runaway) and was using multiple drugs.
14  . . .  She states that she relapsed [secondary to] feeling
15  overwhelmed" (A.R. 527).  Plaintiff admitted to smoking two joints on
16  January 13, 2009 (A.R. 528).  Her diagnoses were major depressive
17  disorder recurrent, moderate, panic disorder without agoraphobia, with
18  a "dysfunction rating" of "mild" on a scale of none, mild, moderate,
19  or severe (A.R. 527-28).  Plaintiff's evaluator recommended a
20  treatment plan involving individual therapy and medication management
21  "as necessary" (A.R. 529).  In an earlier evaluation dated June 23,
22  2007, Plaintiff's psychiatrist diagnosed bipolar disorder and anxiety
23  and prescribed Lamictal, Lexapro, and Risperdal (A.R. 530).  The
24  record contains no other specific mental health treatment records.

25

26      Dr. Sohini Parikh prepared a Complete Psychiatric Evaluation for
27  Plaintiff dated August 21, 2011 (A.R. 463-69).  Plaintiff presented
28  with a limping gait due to alleged pain (A.R. 463).  Plaintiff

reported that she had five children ranging in age from 15 to 25 years old, and that she had been receiving welfare because of the children (A.R. 465).  Plaintiff last worked in 2001, and admitted she used methamphetamine in 1996 and 1997 (A.R. 465).  Plaintiff spent 13 months in jail for possession and violations, with the last incarceration occurring in 1995 (A.R. 465).  Plaintiff reported having depression but admitted that when her mood is up she has lots of energy and "clean, clean, clean, talk, talk, talk, ride the bicycle, racing thoughts, unable to sleep, and spending money unwisely" (A.R. 464).  Plaintiff was taking Lamictal, Celexa, and Risperidone (A.R. 464).

Dr. Parikh examined Plaintiff and diagnosed bipolar disorder (depressive type), pain, high blood pressure, a heart problem, and migraine headaches, and assigned Plaintiff a Global Assessment of Functioning score between 55 and 60 (A.R. 463-69).[8]  Dr. Parikh opined that Plaintiff would have moderate mental difficulties maintaining social functioning, repeated episodes of moderate emotional deterioration in work-like situations, moderate impairment in understanding, remembering and carrying out complex instructions, and in responding to coworkers, supervisors, and the general public, in responding appropriately to usual work situations, and in dealing with

_____

[8]    Clinicians use the GAF scale to rate "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. TR 2000) ("DSM").  A GAF of 51-60 indicates only "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."  Id.

changes in a routine work setting (A.R. 468-69).  However, Plaintiff assertedly would have no mental restrictions in her daily activities, no impairment in Plaintiff's concentration, persistence, and pace, or in Plaintiff's ability to understand, remember, and carry out simple instructions (A.R. 468).

State agency physicians reviewed the available medical record (including Dr. Parikh's evaluation) on June 29, 2011, August 30, 2011, February 22, 2012, and March 8, 2012 (A.R. 62-90).  Initially (on June 29 and August 30, 2011), these doctors found Plaintiff capable of performing light work (*i.e.*, lifting 20 pounds occasionally and 10 pounds frequently, standing and walking six hours in an eight-hour workday, sitting six hours in an eight-hour workday), with: (1) occasional ramp and stair climbing, balancing, stooping, kneeling, crouching, and crawling, but never climbing ladders, ropes, or scaffolds; (2) avoidance of concentrated exposure to extreme cold or heat, and avoidance of even moderate exposure to fumes, odors, dust, gases, poor ventilation, etc., but no hazard limitation; and (3) the ability to complete simple, repetitive tasks for a full workday and workweek, with the ability to deal with peers and supervisors but not the public, and no adaptive limitations (A.R. 69-73).

On reconsideration (on February 22 and March 8, 2012), the doctors added a limitation to avoid concentrated exposure to hazards (A.R. 86).  The doctors also found slightly different mental limitations, indicating that Plaintiff would be able to: (1) recall and manage simple tasks; (2) maintain focus, pace, and persistence for simple tasks for two-hour periods within a normal 40-hour work

schedule; (3) manage appropriate interpersonal interactions in the workplace; and (4) adapt to minor changes in work demands but would have some difficulties managing work-related stress/pressures and unexpected changes in a work routine (A.R. 86-88).

## II.   Substantial Evidence Supports the Conclusion Plaintiff Can Work.

The Administrative Record contains relevant non-medical and medical evidence that "a reasonable mind might accept as adequate to support [the] conclusion" that Plaintiff is not disabled from all employment.

As summarized above, the State agency physicians who reviewed the available medical record found Plaintiff capable of performing light work (A.R. 69-72, 85-89).  These physicians also opined that Dr. Parikh's examining opinion was consistent with "unskilled work with limited public contact,"[9] and not more restrictive than their own assessments (A.R. 69, 73, 78, 89 (referencing A.R. 463-69)).  The ALJ properly placed great weight on the State agency physicians' opinions and significant weight on Dr. Parikh's opinion (A.R. 19-20).  Where, as here, the opinions of non-examining physicians do not contradict "all other evidence in the record," an ALJ properly may rely on these opinions.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995); Curry v. Sullivan, 925 F.2d 1127, 1130 n.2 (9th Cir. 1990).  An ALJ may not rely solely on the opinions of non-examining physicians.  See,

_____

[9]   Unskilled work is defined as work requiring little or no judgment to do simple duties that can be learned on the job in a short period of time.  See 20 C.F.R. § 416.968(a).

1 e.g., <u>Lester v. Chater</u>, 81 F.3d 821, 831 (9th Cir. 1995); <u>Erickson v.</u>
2 <u>Shalala</u>, 9 F.3d 813, 818 n.7 (9th Cir. 1993).  Reliance was not sole
3 in the present case.
4
5        The ALJ relied in part on Dr. Parikh's examining opinion.  <u>See</u>
6 <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001)
7 (consultative examiner's opinion based on independent examination of
8 the claimant constitutes substantial evidence).  The ALJ also appears
9 to have relied at least in part on Dr. Hamilton's treatment notes
10 (indicating that Plaintiff has osteoarthritis of the hands, elbows,
11 and back (A.R. 17 (citing Dr. Hamilton's October 3, 2011 treatment
12 note at A.R. 489))), and Dr. Hamilton's opinion that Plaintiff's
13 reaching and handling would be affected by her pain in her hand joints
14 (A.R. 518), in finding that Plaintiff could not perform repetitive or
15 constant pushing and/or pulling with her hands, or repetitive gross or
16 fine manipulation with both hands (A.R. 13).
17
18        Additionally, the ALJ appears to have relied at least in part on
19 Plaintiff's testimony and Dr. Hamilton's opinion concerning
20 Plaintiff's ability to sit and stand.  Plaintiff testified that she
21 could sit for one hour and stand for a half hour (A.R. 53).  Dr.
22 Hamilton opined that Plaintiff could sit for 20 minutes before needing
23 to change positions, stand for 15 minutes before needing to change
24 positions, must walk around every 30 minutes, and must walk for an
25 hour when she does walk around (A.R. 517-18).  The ALJ limited
26 Plaintiff to standing or walking six hours in an eight-hour day but no
27 more than 15 to 20 minutes at a time, and to sitting six hours in an
28 eight-hour day with regular breaks and brief position changes after 30

1  to 45 minutes (A.R. 13).

2

3      The vocational expert testified that a person with the residual

4  functional capacity the ALJ found to exist could perform unskilled

5  light work as an assembler, inspector, and packager (A.R. 55-56).  If

6  the person were limited to sedentary work with the same restrictions,

7  the person could perform sedentary work as an assembler, sorter, and

8  inspector (A.R. 57-58).  The vocational expert explained that the jobs

9  identified were bench work that would accommodate a sit/stand option

10  (A.R. 58).  The vocational expert's testimony furnishes substantial

11  evidence there exist significant numbers of jobs Plaintiff can

12  perform.  See Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988);

13  see also Barker v. Secretary, 882 F.2d 1474, 1478-80 (9th Cir. 1989);

14  Martinez v. Heckler, 807 F.2d 771, 775 (9th Cir. 1986); see generally

15  Johnson v. Shalala, 60 F.3d 1428, 1435-36 (9th Cir. 1995) (ALJ

16  properly may rely on vocational expert to identify jobs claimant can

17  perform); 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 416.920.

18

19      To the extent the record contains conflicting evidence, it was

20  the prerogative of the ALJ to resolve the conflicts.  See Lewis v.

21  Apfel, 236 F.3d 503, 509 (9th Cir. 2001).  Where, as here, the

22  evidence "is susceptible to more than one rational interpretation,"

23  the Court must uphold the administrative decision.  Andrews v.

24  Shalala, 53 F.3d at 1039-40; accord Thomas v. Barnhart, 278 F.3d 947,

25  954 (9th Cir. 2002); Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir.

26  1997); see also Morgan v. Commissioner, 169 F.3d 595, 601 (9th Cir.

27  1999) (where medical reports are inconclusive, the resolution of

28  conflicts in the evidence is the province of the Commissioner).

1   **III.  The Administration Did Not Materially Err in Discounting Dr.**
2        **Hamilton's Opinions.**

3

4        Plaintiff contends that the Administration improperly discounted
5   Dr. Hamilton's opinions.  A treating physician's conclusions "must be
6   given substantial weight."  Embrey v. Bowen, 849 F.2d 418, 422 (9th
7   Cir. 1988); see Rodriguez v. Bowen, 876 F.2d 759, 762 (9th Cir. 1989)
8   ("the ALJ must give sufficient weight to the subjective aspects of a
9   doctor's opinion. . . .  This is especially true when the opinion is
10  that of a treating physician") (citation omitted); see also Orn v.
11  Astrue, 495 F.3d 625, 631-33 (9th Cir. 2007) (discussing deference
12  owed to treating physician opinions).  Even where the treating
13  physician's opinions are contradicted,[10] "if the ALJ wishes to
14  disregard the opinion[s] of the treating physician he . . . must make
15  findings setting forth specific, legitimate reasons for doing so that
16  are based on substantial evidence in the record."  Winans v. Bowen,
17  853 F.2d 643, 647 (9th Cir. 1987) (citation, quotations and brackets
18  omitted); see Rodriguez v. Bowen, 876 F.2d at 762 ("The ALJ may
19  disregard the treating physician's opinion, but only by setting forth
20  specific, legitimate reasons for doing so, and this decision must
21  itself be based on substantial evidence") (citation and quotations
22  omitted).  Contrary to Plaintiff's arguments, the ALJ stated
23  sufficient reasons for discounting the Dr. Hamilton's opinions.
24  ///

25

26  _____

27        [10]    Rejection of an uncontradicted opinion of a treating
    physician requires a statement of "clear and convincing" reasons.
    Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Gallant v.
28  Heckler, 753 F.2d 1450, 1454 (9th Cir. 1984).

1    The ALJ's residual functional capacity assessment rejected those
2    portions of Dr. Hamilton's opinions suggesting that Plaintiff could
3    lift and carry less than 10 pounds, sit less than two hours and stand
4    and walk less than two hours total in an eight-hour day, and would be
5    absent from work more than three times per month due to her "recently
6    developed" angina pectoris.   Compare A.R. 13 with A.R. 517-19.   The
7    ALJ explained:

8

9        The functional limitations [Dr. Hamilton] assessed are not
10       consistent with the objective findings and the record as a
11       whole.   There were no objective findings in the record
12       pertaining to severe lower extremity problems; however, Dr.
13       Hamilton determined the claimant's ability to stand and walk
14       was very limited.   Moreover, the claimant acknowledged that
15       she shopped at Wal-Mart for an hour [A.R. 225].   She
16       testified she never used an assistive device to ambulate.

17

18   (A.R. 18).

19

20    These stated reasons suffice under the applicable case law.   An
21   ALJ properly may discount a treating physician's opinions that are in
22   conflict with treatment records or are unsupported by objective
23   clinical findings.   See Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th
24   Cir. 2005) (conflict between treating physician's assessment and
25   clinical notes justifies rejection of assessment); Batson v.
26   Commissioner, 359 F.3d 1190, 1195 (9th Cir. 2004) ("an ALJ may
27   discredit treating physicians' opinions that are conclusory, brief,
28   and unsupported by the record as a whole . . . or by objective medical

1  findings"); <u>Connett v. Barnhart</u>, 340 F.3d 871, 875 (9th Cir. 2003)

2  (treating physician's opinion properly rejected where physician's

3  treatment notes "provide no basis for the functional restrictions he

4  opined should be imposed on [the claimant]"); <u>see also</u> <u>Rollins v.</u>

5  <u>Massanari</u>, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ properly may reject

6  treating physician's opinions that "were so extreme as to be

7  implausible and were not supported by any findings made by any doctor

8  . . ."); 20 C.F.R. § 416.927(c)(2) (factors to consider in weighing

9  treating source opinion include the supportability of the opinion by

10 medical signs and laboratory findings as well as the opinion's

11 consistency with the record as a whole).

12

13         In the present case, the ALJ correctly observed that Dr.

14 Hamilton's conclusory opinions lack support in the treatment records

15 and clinical findings, including Dr. Hamilton's own records and

16 findings.  As discussed above, Dr. Hamilton's records include only

17 limited clinical findings, <u>i.e.</u>, (1) one blood chemistry panel from

18 April 26, 2010, showing elevated LDL and triglycerides, which the ALJ

19 noted were treated conservatively with oral medications (A.R. 17

20 citing A.R. 453-54); (2) an abnormal EKG from July 22, 2010 (A.R. 451-

21 52) for which there was no immediate follow up treatment; (3) a

22 cardiology treatment note from July 26, 2011, which, the ALJ observed,

23 reflected a normal heart rate, respiratory rhythm and depth, normal

24 pulses, and no murmurs or pitting edema (A.R. 17 citing A.R. 461); and

25 (4) cardiac imaging results from August 11, 2011, which the ALJ

26 properly characterized as "unremarkable" (A.R. 17 citing A.R. 460).

27 While Plaintiff complained of widely varying ailments to Dr. Hamilton,

28 the only observations on examination included in all of Dr. Hamilton's

treatment notes were of: (1) a mildly tender ankle from an ankle sprain on December 9, 2010 (A.R. 447); (2) sinus problems, a stiff gait on the right side, and tender wrist and knee on March 30, 2011 (A.R. 443-44); (3) anxiety and depression on October 3, 2011 (A.R. 489); (4) knotty thumbs on January 30, 2012 (A.R. 485); (5) a tender and enlarged right metacaropphalangeal joint on May 8, 2012 (A.R. 525); and (6) scattered knotty PIP joints on June 26, 2012 (A.R. 522). Notably, Dr. Hamilton herself apparently doubted the credibility of Plaintiff's subjective complaints.  On December 9, 2010, Dr. Hamilton stated that Plaintiff "comes up [with] 1 excuse after another – now comes up [with] tender feet" (A.R. 445).  Upon examination, Dr. Hamilton concluded that Plaintiff's feet were "not tender or numb to testing now" (A.R. 447).  Dr. Hamilton's December 9, 2010 assessment did not include "tender feet" (A.R. 447).  Even if Dr. Hamilton had assessed Plaintiff with "tender feet" that day, such assessment together with Dr. Hamilton's very limited findings on examination would not justify the profound standing and walking limitations Dr. Hamilton indicated on Plaintiff's disability form.[11]

Additionally, Plaintiff's admission that she is able to shop in Wal-Mart for an hour without an assistive device arguably is inconsistent with Dr. Hamilton's opinion that Plaintiff could stand

---

[11]   Plaintiff asserts that the ALJ had a duty to recontact Dr. Hamilton to obtain clarification and/or additional evidence. See Plaintiff's Motion at 5 (citing 20 C.F.R. §§ 404.1512(e)(1) and 416.912(e)(1) (eff. through March 25, 2012).  Paragraph (e) has been deleted from these sections and was not in effect at the time the ALJ rendered her decision.  Moreover, Dr. Hamilton indicated the purported bases for her opinions sufficiently for the ALJ to evaluate the opinions.  See A.R. 517-25.

and walk less than two hours total in an eight-hour day, and also may be inconsistent with the limitation to lifting no more than 10 pounds. A material inconsistency between a treating physician's opinion and a claimant's admitted level of daily activities can furnish a specific, legitimate reason for rejecting a treating physician's opinion.  See e.g., Rollins v. Massanari, 261 F.3d at 856.

For these reasons, the ALJ did not materially err in discounting Dr. Hamilton's opinions.

**IV.   The ALJ Did Not Materially Err in Discounting Plaintiff's Credibility.**

Plaintiff also contends that the ALJ erred in finding Plaintiff's subjective complaints less than fully credible.  No material error occurred.

An ALJ's assessment of a claimant's credibility is entitled to "great weight." Anderson v. Sullivan, 914 F.2d 1121, 1124 (9th Cir. 1990); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985).  Where, as here, the ALJ finds that the claimant's medically determinable impairments reasonably could be expected to cause the alleged symptoms of which the claimant subjectively complains, any discounting of the claimant's complaints must be supported by specific, cogent findings. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010); Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995); but see Smolen v. Chater, 80 F.3d at 1282-84 (indicating that ALJ must offer "specific, clear and convincing" reasons to reject a claimant's testimony where there is no

evidence of malingering).[12]   An ALJ's credibility findings "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." See Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal citations and quotations omitted); see also Social Security Ruling 96-7p.  As discussed below, the ALJ stated sufficient reasons for deeming Plaintiff's subjective complaints less than fully credible.

Plaintiff testified that she could not work due to her alleged arthritis, fibromyalgia, heart condition (which she claims includes periodic "heart attacks"), and depression and anxiety (A.R. 35, 38, 41-47).  She said she is worn out and exhausted (A.R. 35).  Plaintiff said her "heart attacks" result in chest pain and pressure and pain in her left arm that last for a half hour to an hour and require her to lie down (A.R. 36, 38).  Plaintiff reportedly was taking nitroglycerine for her alleged chest pain (A.R. 36).  Notwithstanding these complaints, Plaintiff testified that she had been looking for work but there was "nothing that's been out there" (A.R. 34-35).

///

///

---

[12]   In the absence of an ALJ's reliance on evidence of "malingering," most recent Ninth Circuit cases have applied the "clear and convincing" standard.  See, e.g., Chaudhry v. Astrue, 688 F.3d 661, 670, 672 n.10 (9th Cir. 2012); Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012); Taylor v. Commissioner, 659 F.3d 1228, 1234 (9th Cir. 2011); see also Ballard v. Apfel, 2000 WL 1899797, at *2 n.1 (C.D. Cal. Dec. 19, 2000) (collecting earlier cases).  In the present case, the ALJ's findings are sufficient under either standard, so the distinction between the two standards (if any) is academic.

As for daily activities, Plaintiff testified that she gets her 17 year old son up to go to school and drives him "like a block or so" to school (A.R. 47).  Plaintiff also helps her 19 year old daughter try to find a job by giving her rides when Plaintiff can (A.R. 32-33, 49). Plaintiff watches television, makes her bed, straightens her room, keeps things picked up around the house, and lies down to rest for a "couple" hours between noon and 3:00 p.m. (A.R. 49-50, 54).  Plaintiff claimed she does not do laundry or cook (A.R. 50).  Plaintiff said that, twice a week, she visits her mother who lives a mile away and plays games with her mother at the senior center (A.R. 48-49). Plaintiff reportedly grocery shops with her children and attends some activities at her son's school (A.R. 50).

In a Function Report - Adult form dated May 29, 2011, Plaintiff reported she has trouble bending which allegedly affects her ability to dress, bathe, shave, and care for her hair (A.R. 223).  However, unlike in her testimony, Plaintiff stated that she cooks (sandwiches, frozen dinners, eggs, and toast) approximately two times a week, and does laundry once a week for approximately four hours (A.R. 224). Plaintiff also reported that she visits her mother more times per week (i.e., three to four times) to play games (A.R. 226).  Plaintiff reported shopping weekly at Wal-Mart for about an hour (A.R. 225).

Plaintiff testified she thought she could walk around her block (A.R. 48).  Plaintiff said she did not think she could do a simple, low stress sit-down job where she would not have to lift more than 10 pounds, stating that she could sit for an hour, stand for a half hour, and lift maybe five pounds (A.R. 53-54).  In her Function Report,

Plaintiff reported that she could only lift 10 pounds and walk two
blocks before supposedly needing to rest for 15 minutes (A.R. 227).

    The ALJ deemed Plaintiff's testimony less than fully credible
based on: (1) the inconsistency between the objective medical evidence
and Plaintiff's allegations of chest pain and arthritis;
(2) Plaintiff's daily activities, which the ALJ found were
inconsistent with the presence of an incapacitating or debilitating
condition; (3) Plaintiff's attempts to seek employment after her
alleged onset date; (4) Plaintiff's sporadic work history; and
(5) inconsistencies in Plaintiff's statements that she had used hand
braces since 2001 and her failure to mention the use of hand braces in
her function reports (A.R. 15).

    With regard to the first reason, the ALJ believed Plaintiff was
attempting to exaggerate the severity of her symptoms by claiming to
have chest pain and arthritis that the objective medical record
assertedly did not support (A.R. 15).  While Plaintiff's complaints of
chest pain may not have been supported consistently by objective
medical evidence, there arguably exists some evidence in the record
that Plaintiff sometimes has had legitimate reasons for complaining of
chest pain (e.g., Plaintiff had what was thought to be two heart
attacks and on multiple occasions was given nitroglycerine for her
alleged pain).  As to arthritis, both Dr. Hamilton and the
rheumatologist who examined Plaintiff observed signs of
osteoarthritis.  Therefore, the Court finds that this stated reason is
not a cogent reason for rejecting Plaintiff's credibility.  However,
under Carmickle v. Commissioner, 533 F.3d 1155, 1163 (9th Cir. 2008),

25

the infirmity of one or two supporting reasons for an ALJ's
credibility determination does not require overturning the
determination if independently valid supporting reasons remain.
Independently valid supporting reasons remain in the present case.

Second, Plaintiff's admitted daily activities, which include
getting her son ready and driving him to school, caring for her
animals, doing mild housekeeping, watching television, helping her
daughter seek employment, shopping for one hour at Wal-Mart once a
week, and playing games with her mother several times a week, tend to
undermine her assertion that she could not do a simple sit-down job.
Plaintiff argues that her daily activities do not reflect an ability
to sustain full time employment.  See Plaintiff's Motion at 9-10.  It
is difficult to reconcile particular Ninth Circuit decisions upholding
and striking down ALJs' rejections of claimants' credibility in
reliance on the claimants' daily activities.  Compare Burch v.
Barnhart, 400 F.3d 676, 680 (9th Cir. 2005) with Vertigan v. Halter,
260 F.3d 1044, 1049-50 (9th Cir. 2001) and Gallant v. Heckler, 753
F.2d 1450, 1453-55 (9th Cir. 1984).  Assuming arguendo that the ALJ's
partial reliance on this consideration also was improper, the ALJ's
credibility determination nevertheless would stand.  The ALJ's
remaining reasons are legally sufficient.

Third, Plaintiff's continued search for a job after her alleged
onset date constituted a sufficient reason for the ALJ to find
Plaintiff's testimony less than credible.  See Copeland v. Bowen, 861
F.3d 536, 542 (9th Cir. 1988) (plaintiff's job search efforts
discredited his allegations of disability); Bray v. Commissioner of

26

1 Social Security Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (fact that
2 a claimant has sought out employment weighs against a finding of
3 disability); see also Ghanim v. Colvin, 763 F.3d 1154, 1165 (9th Cir.
4 2014) ("continued receipt" of unemployment benefits can cast doubt on
5 a claim of disability); but see Webb v. Barnhart, 433 F.3d 683, 688
6 (9th Cir. 2005) ("That Webb sought employment suggests no more than
7 that he was doing his utmost, in spite of his health, to support
8 himself").
9
10     Fourth, Plaintiff's sporadic work history was also a sufficient
11 reason for the ALJ to find Plaintiff's testimony less than credible.
12 See Smolen v. Chater, 80 F.3d at 1284 (ALJ may consider claimant's
13 "work record" in determining claimant's credibility); see also Deck v.
14 Colvin, 2014 WL 73388792, at *1 (9th Cir. Dec. 30, 2014) (sporadic
15 work history is a specific, clear and convincing reason for
16 discrediting claimant's pain testimony).
17
18     Finally, the ALJ properly could rely on Plaintiff's own
19 inconsistent statements in finding Plaintiff not credible. See Burch
20 v. Barnhart, 400 F.3d at 680 ("In determining credibility, an ALJ may
21 engage in ordinary techniques of credibility evaluation, such as
22 considering . . . inconsistencies in claimant's testimony.").
23 Plaintiff claimed in her testimony that she had been using hand braces
24 since 2001 (A.R. 52). Yet, Plaintiff did not report using hand braces
25 in any of her function reports. The ALJ reasoned, "[a]lthough the
26 inconsistent information provided by the claimant . . . may not be the
27 result of a conscious intention to mislead, nevertheless, the
28 inconsistencies suggest that the information provided by the claimant

generally may not be entirely reliable" (A.R. 15).

     In sum, the ALJ stated sufficient reasons to allow this Court to conclude that the ALJ discounted Plaintiff's credibility on permissible grounds. <u>See</u> <u>Moisa v. Barnhart</u>, 367 F.3d at 885.  The Court therefore defers to the ALJ's credibility determination.  <u>See</u> <u>Lasich v. Astrue</u>, 252 Fed. App'x 823, 825 (9th Cir. 2007) (court will defer to ALJ's credibility determination when the proper process is used and proper reasons for the decision are provided); <u>accord</u> <u>Flaten v. Secretary of Health & Human Services</u>, 44 F.3d 1453, 1464 (9th Cir. 1995).

### CONCLUSION

     For all of the reasons discussed herein, Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

     LET JUDGMENT BE ENTERED ACCORDINGLY.

          DATED: February 3, 2015.


                    _____/S/_____
                         CHARLES F. EICK
                    UNITED STATES MAGISTRATE JUDGE